UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6220 CIV-MOORE/O'SULLIVAN

BANCO   INTERNACIONAL,   S.A.,   a
foreign corporation,

     Plaintiff,

v.

THE BANK OF NEW YORK, a New York
corporation,

     Defendant.

_____/

### DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER VENUE

Pursuant to Local Rule 7.1, defendant, The Bank of New York ("BNY"), files this Reply Memorandum of Law in Support of Its Motion to Dismiss or in the Alternative to Transfer Venue. Banco Internacional, S.A. ("Banco") sets forth no valid grounds for opposing the transfer and fails to plead or prove grounds for personal jurisdiction.

### MEMORANDUM OF LAW

The Complaint should be dismissed outright because Banco has failed to allege grounds for asserting general personal jurisdiction over BNY. Nevertheless, because Banco has put forth no valid grounds for opposing a transfer of venue, BNY will address that issue first. BNY will next address the issue of personal

jurisdiction, which is unnecessarily contentious because of Banco's fundamental misunderstandings of the law and the facts.

## I.    Transfer Is Appropriate

As an initial matter, the contractual dispute at issue has no contact with this forum.  Banco mistakenly believes that its letter of credit reimbursement dispute with BNY has some attenuated connection with Florida because the contract for sale between the letter of credit "Applicant," Terry Products in North Carolina, and the "Beneficiary," Polar Industries, S.A. in Guatemala, called for the product to pass through Miami on its way to North Carolina. The most elementary tenet of letter of credit law, however, is that the transaction consists of three entirely separate and distinct contracts:

> (1) the underlying sales agreement between the Applicant and Beneficiary;[1]
> (2) the reimbursement agreement between the Applicant and the bank that issues the letter of credit (the "Issuer," in this case BNY); and
> (3) the letter of credit agreement between the bank and the Beneficiary

See, e.g., 13 Fla. Jur. 2d, Credit Cards and Letters of Credit § 21 (and cases cited therein).  Each contract is entirely distinct from the others.

---

[1] Even if the applicant and beneficiary were in this Court suing over their sales agreement, the "connection" to this forum -- the product passed through here on its way north -- would be so tenuous as not to serve as a basis for jurisdiction or venue.

2

This dispute concerns yet a fourth relationship: between Banco, the advising bank in Guatemala, and BNY, the issuing bank in New York. This dispute has nothing to do with the underlying contract between the applicant and beneficiary. The agreement between Banco and BNY has no connection with this forum.

Banco does not dispute that no witnesses or documents are in this jurisdiction; they are in New York. It does not dispute that the only U.S. forum with any connection to this dispute is the Southern District of New York.[2] Banco cannot deny that the District Court of the Southern District of New York is more familiar with New York law and is better able to resolve this dispute. Banco's conclusory statement that it will be a substantial financial hardship to prosecute this action in New York is unsupported and unexplained. The only offered rationale for not transferring the action is that Miami is more convenient for Banco because it is closer to Guatemala than New York. The convenience of shaving a few hours off of a plane ride does not counterbalance the substantial reasons for transferring the action, and it hardly

---

[2]In a final attempt to find some connection with this forum, Banco states that it has "the benefit of an affiliate bank here in Miami." (Banco Mem. at 8.) This affiliate is not a party, its employees are not witnesses, and Banco does not even attempt to explain how the location of its affiliate is relevant. Banco also reiterates that BNY has a designated registered agent, CT Corporation System, in Florida. Once again this fact is irrelevant to the inquiry of whether in the interests of justice and for the convenience of the parties the action ought to be transferred to New York.

COLL DAVIDSON SMITH SALTER & BARKETT • PROFESSIONAL ASSOCIATION • ATTORNEYS AT LAW • (305) 373-5200

constitutes "substantial financial hardship."

This case is similar to <u>Republic of Bolivia v. Philip Morris Cos.</u>, 39 F. Supp. 2d 1008 (S.D. Tex. 1999). There, like here, the foreign plaintiff had no valid grounds for opposing the § 1404 transfer other than it chose to litigate in Texas rather than the District of Columbia. And while BNY does not mean to imply that this Judge "moves his lips when he reads," (39 F. Supp. 2d at 1009), the Southern District of New York is better equipped to resolve substantive questions of New York law.

Finally, in an attempt to sway this Court with irrelevant matters, Banco states that since BNY is the named plaintiff in Florida on certain mortgage foreclosures, there is no reason to transfer venue in this case. These other suits will be discussed in more detail below. They are irrelevant to the inquiry of whether <u>this</u> action should be tried in New York. Suffice it to say that if BNY, as the indenture trustee of a securitized package of home loans, authorizes the foreclosure of certain security located in Florida, where the real estate is located, then Florida is the proper venue for that foreclosure. In a case where BNY is sued for a contract made in New York, where neither party is in Florida[3] and the transaction has nothing to do with Florida, New York is the

---

[3]Banco mistakenly cites Florida's venue statute to argue that BNY "resides" in Florida. (Banco Mem. at 7 (citing Fla. Stat. § 47.051).) This section has no applicability in this proceeding. Venue is governed by 28 U.S.C. § 1391, and this motion is made pursuant to 28 U.S.C. § 1404.

4

appropriate forum.

## II.   <u>Banco Failed and Still Fails to Allege Jurisdiction over BNY</u>

As an initial matter, Banco is mistaken in its belief that general jurisdiction exists over BNY solely because it has a registered agent in Florida.  There is no general jurisdiction over an entity in a state unless that entity has substantial, not isolated, activity in that state.  Banco admittedly failed to allege such activity, and has failed to prove it in its memorandum.[4]

The states have a number of statutes on their books pursuant to which they assert jurisdiction over foreign entities.  The Supreme Court in <u>World-Wide Volkswagon Corp. v. Woodson</u>, 444 U.S. 286 (1980)(addressing the Oklahoma long-arm statute), held that regardless of what the statutes may say, the courts must undertake an independent due process inquiry to determine whether personal jurisdiction exists.

The Florida intermediate appellate decisions cited by Banco do provide that where a corporate entity has a registered agent, no such "minimum contacts" due process inquiry is necessary.  Those cases are wrong:

---

[4]Banco has never alleged that specific jurisdiction exists. Indeed it cannot because, as discussed above, the transaction at issue has no connection with this forum.  Banco instead relies solely on the presence of a designated registered agent: CT Corporation System.

5

If these state court cases actually stand for or can be interpreted as standing for the idea that registration to do business in Florida by a defendant is enough in and of itself to find personal jurisdiction over such a defendant, they are in conflict with Supreme Court precedent and also later Florida Supreme Court precedent.

Sofrar, S.A. v. Graham Eng'g Corp., 35 F. Supp. 2d 919 (S.D. Fla. 1999)(citing Venetian Salami Co. v. J.S. Parthenais, 554 So. 2d 499 (Fla. 1989)).    Unless an entity conducts substantial business in Florida, there is no general jurisdiction over that entity in Florida, regardless of whether or not it has a registered agent for the acceptance of service of process.    Id. at 921.

Nowhere in its complaint does Banco allege grounds for asserting general jurisdiction over BNY.    The motion to dismiss is thus well grounded.    In an attempt to overcome this pleading deficiency, Banco argues unpleaded and unproven facts in its memorandum of law which it mistakenly believes serve as a basis for asserting that general jurisdiction exists.

As an initial matter, BNY has put forth evidence in the affidavit of Mr. Kochenthal that it conducts no banking business in Florida.    Banco regretfully chose to accuse the affiant of being "untruthful" without first researching its accusations.[5]    Being

_____

[5]Banco filled its memorandum with such unfortunate accusations.    For example, it accuses BNY for being "misleading and incomplete" in its characterization of the facts of this case, apparently for not admitting that it has a registered agent in Florida, the price of being authorized to do business in this state.    (Banco Mem. at 2.)    BNY did, however, acknowledge on page 2 of its motion, the Facts section, that it has a registered agent here.

6

authorized by the Florida Secretary of State to do business in Florida is not the same as being authorized to do banking business, which is controlled by the Department of Banking and Finance. "Banking business" is a term of art which includes "(a) The business of receiving demand and time deposits; (b) The payment of checks; and (c) The conduct of a trust business when duly authorized." Fla. Stat. § 658.12(9) (general commercial banking business). BNY is not a Florida state charted bank. It has no branches in Florida and conducts no banking business in Florida.

Banco attached some docket sheets to its memorandum and states that, because BNY allegedly has been a litigant in Florida, it must be doing banking business here. As an initial matter, merely suing or being sued in Florida courts does not establish general jurisdiction over an entity, and Banco cites no cases for that incorrect proposition. The State of Florida readily admits that it cannot hold access to its courts ransom unless a foreign corporation concedes to general jurisdiction, and a foreign corporation is not required to have a registered agent as a price for:

    (a)  Maintaining, defending, or settling any proceeding;
    (g)  Creating or acquiring indebtedness, mortgages, and security interests in real or personal property;
    (h)  Securing or collecting debts or enforcing mortgages and security interests in property securing the debts.

Fla. Stat. § 607.1507 (listing acts that are not considered "doing business" in Florida). A party can bring any number of suits

COLL DAVIDSON SMITH SALTER & BARKETT • PROFESSIONAL ASSOCIATION • ATTORNEYS AT LAW • (305) 373-5200

against Florida residents without fear that it will be subject to the general jurisdiction of Florida courts. The only test is whether BNY conducts substantial business here.

It is impossible to tell from the docket sheets the nature of the suits allegedly involving BNY.[6] Only the cover page of one complaint is included. About this, Banco makes the following false statement: "most of the cases recently filed by BNY are mortgage foreclosures, certainly part of their banking business." (Banco Mem. at 2.) This statement is unsubstantiated by Banco and it not only mischaracterizes the one complaint attached, but it reflects a fundamental lack of understanding of mortgage business and banking business. In <u>The Bank of New York as Trustee under the Pooling and Servicing Agreement dated as of August 31, 1997, Series #1997-C v. Murray</u>, No. 00-01038 (11th Judicial Circuit in and for Dade County, filed Jan. 13, 2000), the Bank of New York is not suing in its own right, but as an indenture trustee. It is not suing to foreclose a loan it made, and it will not be the ultimate beneficiary of funds recovered as part of that foreclosure. Had Banco flipped to the Note (Exhibit A of that Complaint), it would have seen that the lender was TMS Mortgage Inc. <u>See</u> Exhibit "A" hereto.

When a Florida lender makes a loan to a home buyer, the lender

---

[6]Some appear to involve separate corporations that have "Bank of New York" in their name, such as The Bank of New York Trust Company of Florida, which is not a party to this action.

8

receives a note and a mortgage as security.  Lenders often sell the
payable and security to an entity that packages the income stream
and collateral with other notes and mortgages ("pooling") and the
group is sold in a securities market to bondholders.    Mortgage
servicing companies collect the payments from the mortgagors,
perform escrow services for taxes and insurance, and remit the
remaining amount to the bondholders as principal and interest
("servicing").  A trustee is appointed for the indenture trust that
governs the bonds.[7]  The bondholders, however, are the mortgagees,
not the indenture trustee.   In Murray, BNY is the indenture
trustee, not the lender, mortgagor, mortgagee, pooler, or servicer.
The accusation that, because it is the named plaintiff in a suit it
brings on behalf of the bondholders, BNY must have conducted
banking business with respect to that mortgage is inexcusable
coming from another financial entity like Banco.

Banco has thus not rehabilitated its complaint and it has
still failed to plead or prove that BNY conducts substantial
business in Florida.


## III. Conclusion

Banco has failed to allege or prove a basis for personal
jurisdiction, and presents no valid reason for opposing a transfer

---

[7]The rights and duties of an indenture trustee are set forth
in the Trust Indenture Act, and those include reporting defaults by
the obligor to the bondholders.  See 15 U.S.C. § 77aaa et seq.

9

of this action to the Southern District of New York.  The Complaint should be dismissed, or in the alternative transferred to the Southern District of New York.

> Respectfully submitted,
>
> COLL DAVIDSON SMITH
>  SALTER & BARKETT, P.A.
> Counsel for Defendant
> 3200 Miami Center
> 201 South Biscayne Boulevard
> Miami, Florida 33131-2312
> PH:  (305) 373-5200
> FAX: (305) 374-7296
> E-Mail: attys@cdclaw.com
>
> By: _____
>     Vance E. Salter
>     Fla. Bar No. 232981
>     Christopher N. Johnson
>     Fla. Bar No. 0069329

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 1st day of March 2000 to Miguel A. Martin, Esq., Renee Adwar, Esq., M.A. Martin & Associates, P.A., counsel for plaintiff, 848 Brickell Avenue, Suite 830, Miami, Florida 33131.

> By: _____
>     Vance E. Salter

213991

10

ATTACHMENT / EXHIBIT A

0099416653

# NOTE

August 29, 1997
Date

3098 NW 98th Street, Miami, FL 33147

Property Address

1. **BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay Ninety-Six Thousand, Three Hundred and 00/100 Dollars (U.S. $ 96,300.00           )
(this amount will be called "principal"), plus interest, to the order of the Lender. The Lender is TMS Mortgage Inc., dba The Money Store
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note and who is entitled to receive payments under this Note will be called the "Note Holder."

2. **INTEREST**
I will pay interest at an annual rate of 10.500 %
Interest will be charged on unpaid principal beginning on September 15, 1997           , and will continue until the full amount of principal has been paid. Interest shall continue to accrue at this rate after the maturity or default of this loan.

3. **PAYMENTS**
I will pay principal and interest by making payments each month in the sum of U.S. $ 880.89
("monthly payments").
I will make my monthly payments on the Fifteenth           day of each month beginning on October 15, 1997
I will make monthly payments every month until I have paid all of the principal and interest and any other fees or charges, described below, that I may owe under this Note. If, on September 15, 2027
any sum still remains unpaid, I will pay what I owe in full on that date. All monthly payments received by Note Holder shall be applied first to accrued interest and the remainder, if any, to the principal.
If I owe the Note Holder any late charges, or other fees or charges ("other charges"), they will be payable upon demand of the Note Holder. Unless prohibited by law, the application of payments may be affected by the imposition of other charges. Therefore, payments of other charges, whether paid to the Note Holder in addition to the monthly payment or separately, will be applied in a manner at the absolute discretion of the Note Holder, subject to applicable law.
I will make my monthly payments at P.O. Box 1058, Newark, NJ 07101-1058

or at a different address if required by the Note Holder.

4. **BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of    10    calendar days after the date it is due, I will promptly pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my full monthly payment. I will pay this late charge only once on any late monthly payment.
(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

FLORIDA NOTE (ACTUARIAL) (9609)   *Original - File*
M0C1-1FL                                        Page 1 of 3

*P 11*

## EXHIBIT "A"



**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees out of court, in trial, on appeal, in bankruptcy proceedings, or otherwise, foreclosure fees and court costs.

**(F) Check Collection Charges**

If I present the Note Holder with a check, negotiable order of withdrawal, share draft or other instrument in payment that is returned or dishonored for any reason, I will pay a check collection charge to the Note Holder. The amount of the charge will not be greater than U.S. $ 15.00                     .

5.    **THIS NOTE SECURED BY A SECURITY INSTRUMENT**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), on real property (the "Property") described in the Security Instrument and dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. The Security Instrument describes how and under what conditions I may also be required to make immediate payment in full of all amounts I owe under this Note. I agree to these conditions. Some of these conditions are as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

6.    **BORROWER'S PAYMENTS BEFORE THEY ARE DUE**

Subject to the application of payments described in Section 3, I have the right to make payments of principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a partial prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other partial prepayment, I must still make each later payment as it becomes due and in the same amount.

I may make a full or partial prepayment at any time. However, if within the first  60                     months from the date of this loan I make any prepayment(s) within any 12-month period whose total amount exceeds 20% of the original principal amount of this loan, I will pay a prepayment charge equal to six months' interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20% of the original principal amount of this loan.

7.    **BORROWER'S WAIVERS**

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else, also waives these rights. These persons are known as "guarantors," "sureties" and "endorsers."

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail addressed to me at the Property Address described in the Security Instrument. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note. This Note is intended by Lender and me as a complete and exclusive statement of its terms, there being no conditions to the enforceability of this Note. This Note may not be supplemented or modified except in a writing signed by me and the Note Holder. This Note benefits Lender, its successors and assigns, and binds me and my heirs, personal representatives and assigns.

**10. APPLICABLE LAW**

This Note shall be governed by the laws of the State of Florida. The Note Holder does not intend to charge any amount of interest or other fees or charges in the nature of interest that exceed the maximum rate allowed by applicable law. If a law which applies to this loan and sets maximum loan charges is finally interpreted so that the interest and other charges collected or to be collected in connection with this loan exceed the permitted limits, then: (A) any such interest or other charge shall be reduced by the amount necessary to reduce the interest or other charge to the permitted limit; and (B) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**11. BORROWER'S COPY**

I hereby acknowledge receipt of a filled-in copy of this Note.

**12. DOCUMENTARY STAMPS**

The proper amount of documentary stamp and recordation charges required in connection with the recordation of the Security Instrument have been paid.

_____ (Seal)
Charles P Murray          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
Nadine V Murray           -Borrower

_____ (Seal)
                          -Borrower
                          (Sign Original Note Only)

Pay to the order of:

TMS Mortgage Inc., dba The Money Store
By _____
FLORIDA NOTE (ACTUARIAL) (9608)   Original - File
M001-3FL

MICHELE CURTIS
Ass't Vice President

0099416653

FRIENDSHIP TITLE CO.
INTERCONTINENTAL BANK BLDG.
3899 N.W. 7th ST. • SUITE 213
MIAMI, FLORIDA 33126

After recording return to:
The Money Store/Packaging
P.O. Box 160128
Sacramento, CA 95816-0128

REC: 17775PG4467    97R400396 1997 SEP 04 16:10

DOCSTMPS    337.05 INTNG    192.60
HARVEY RUVIN, CLERK DADE COUNTY, FL

Prepared by:
Jennifer Manzi
Production Assistant
1625 N. Market Blvd., Suite 230
Sacramento, CA 95834

# MORTGAGE

0099416653

THIS MORTGAGE ("Security Instrument") is made this 29th Day of August, 1997 between the Mortgagor, Charles P. Murray And Nadine V. Murray, His Wife
Whose Post Office address is: 3098 N.W. 98th Street, Miami, Florida 33147

(herein "Borrower"), and the Mortgagee, TMS Mortgage Inc., dba The Money Store, which is organized and existing under the laws of New Jersey
and whose address is 1625 N. Market Blvd., Suite 230,
Sacramento, CA 95834
(herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of Ninety-Six Thousand, Three Hundred and 00/100
Dollars (U.S. $ 96,300.00                    ) together with interest, which indebtedness is evidenced by Borrower's note dated August 29, 1997                    (the "Note"), providing monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on September 15, 2027

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; extensions and renewals of the Note; the payment of all other sums, with interest thereon, advanced in accordance with this Security Instrument to protect the security of this Security Instrument; and the performance of the covenants and agreements of Borrower contained in this Mortgage, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in Dade                    County, Florida:
(SEE EXHIBIT "A" ATTACHED)

Lot 6, in Block 11 of AMENDED PLAT OF THE TROPICS, according to the Plat thereof, as recorded in Plat Book 10, at Page 17, of the Public Records of Dade County, Florida.

being the same property commonly known as: 3098 NW 98th Street, Miami, FL 33147
("Property Address").

FLORIDA MORTGAGE (9405) Original - Record
M002-1FL                    Page 1 of 8





OFF:
REC: 17775 PG 4468

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Security Instrument. All of the foregoing, together with such property (or the leasehold estate if this Security Instrument is on a leasehold) are called the "Property."

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and covenants that Borrower will defend generally the title to the Property against all claims and demands, subject to encumbrances of record. Borrower further warrants, represents and covenants as follows:

1.     **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness and all other charges evidenced by the Note.

2.     **Funds for Taxes and Insurance.** If required by Lender, and subject to applicable law, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974, as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under Paragraph 18, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.



OFF. REC: 17775 PG 4469

**3.    Application of Payments.** All payments of principal and interest received by Lender shall be applied as provided in the Note. If Borrower owes Lender any late charges, or other fees or charges ("other charges"), they will be payable upon demand of Lender. Unless prohibited by law, the application of payments may be affected by the imposition of other charges. Therefore, payments of other charges, whether paid to Lender in addition to the monthly payment or separately, will be applied in a manner at the absolute discretion of the Lender. Borrower agrees that Lender may apply any payment received under Paragraphs 1 and 2, either first to amounts payable under Paragraph 1, or first to amounts payable under Paragraph 2.

**4.    Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument, if any, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Security Instrument, and leasehold payments or ground rents, if any.

**5.    Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," flood and any other hazards as Lender may require, from time to time, and in such amount and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided that such approval shall not be unreasonably withheld. If the Borrower fails to maintain the coverage described above, Lender may, at its option, obtain coverage to protect its rights on the Property in accordance with Paragraph 8. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument. If any insurance proceeds are made payable to Borrower, Borrower shall promptly pay such amounts to Lender, including, without limitation, the endorsement to Lender of any proceeds made by check or other draft.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amounts of the payments. If under Paragraph 18 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

The provisions of this Paragraph 5 concerning the payment, disbursement or application of insurance proceeds shall apply to any insurance proceeds covering the Property whether or not (i) Lender is a named insured, (ii) the policy contains a mortgage clause, or (iii) Lender has required Borrower to maintain the insurance. Borrower authorizes and directs any insurer to list Lender as a loss payee on any payment of insurance proceeds upon Lender's notice to insurer of Lender's interest in the insurance proceeds.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Security Instrument.



**OFF:** 17775PG4470

6.    **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit nor permit waste or impairment or deterioration of the Property. Borrower shall not do anything affecting the Property that is in violation of any law, ordinance or government regulation applicable to a residential property, and Borrower shall comply with the provisions of any lease if this Security Instrument is on a leasehold. If this Security Instrument is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

Unless Lender and Borrower otherwise agree in writing, all awards, payments or judgments, including interest thereon, for any injury to or decrease in the value of the Property received by Borrower will be used to restore the Property or applied to the payment of sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amounts of the payments. Borrower agrees that in the event an award, payment or judgment includes compensation for both injury or decrease in the value of the Property and compensation for any other injury or loss, the total amount of such award, payment or judgment shall be deemed compensation with respect to the Property and Borrower hereby consents to Lender's intervention into any proceedings regarding the Property.

7.    **Loan Application Process.** Borrower shall be in default under this Security Instrument, if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information directly bearing on Lender's decision to extend credit to Borrower), in connection with the loan evidenced by the Note.

8.    **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation, forfeiture, or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs or abate nuisances. Although Lender may take action under this Paragraph 8, Lender does not have to do so. The right of Lender to protect Lender's rights in the Property shall include the right to obtain at Borrower's expense, property inspections, credit reports, appraisals, opinions of value or other expert opinions or reports, unless prohibited by law.

Any amounts disbursed by Lender under this Paragraph 8 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon demand of Lender.

9.    **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect until such time as the requirement for the insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

10.    **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor as related to Lender's interest in the Property.



REC: 17775 PG 447 I

11.    Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of such payments.

12.    Borrower Not Released; Forbearance By Lender Not a Waiver; Acceptance of Partial Payment. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or may refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender on one or more occasions in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the later exercise of that or any other right or remedy.

Lender may accept partial payments from Borrower, without waiving or forbearing any of its rights under this Security Instrument or under the Note even if such payments are notated as a payment in full, or with a notation of similar meaning.

13.    Successors and Assigns Bound; Joint and Several Liability; Signers. The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 17 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who signs this Security Instrument, but does not execute the Note: (a) is signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property, including any homestead right or interest, to Lender under the terms of this Security Instrument, (b) is not personally liable on the Note or under this Security Instrument, and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.



OFF. 17775 PG 4472

14.    **Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing such notice by first class mail addressed to the Property Address or to such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

15.    **Governing Law; Severability.** The state and local laws applicable to this Security Instrument shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Security Instrument. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision, and to this end, the provisions of this Security Instrument and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

16.    **Borrower's Copy.** Borrower shall be furnished a copy of the Note and of this Security Instrument at the time of execution or after recordation hereof.

17.    **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18.    **Acceleration; Remedies.** Except as provided in Paragraph 17 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Security Instrument, including the covenants to pay when due any sums secured by this Security Instrument, Lender prior to acceleration shall give notice to Borrower as provided in Paragraph 14 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.

The notice shall further inform Borrower of the right to reinstate this Security Instrument after acceleration and the right to bring a court action or to assert in the judicial proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option may declare all of the sums secured by this Security Instrument to be immediately due and payable without further demand and may foreclose this Security Instrument by judicial proceeding and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees, court costs, and costs of documentary evidence, abstracts and title reports, even if the breach is cured prior to the completion of any foreclosure.



OFF. 17775 PAGE 4473

19.    **Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Security Instrument due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Security Instrument discontinued at any time prior to the later of the filing of a certificate of sale by the clerk of the court or the time specified in any judgment, order or decree of foreclosure (or such other period as applicable law may specify for reinstatement) if: (a) Borrower pays Lender all sums which would be then due under this Security Instrument and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Security Instrument; (c) Borrower pays all reasonable attorneys' fees, trustees' fees and court costs; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unimpaired. Upon such payment and cure by Borrower, this Security Instrument and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred. This right to reinstate shall not apply, however, in the case of acceleration pursuant to Paragraph 17.

20.    **Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under Paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under Paragraph 18 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Security Instrument. Lender and the receiver shall be liable to account only for those rents actually received.

21.    **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate for normal residential uses and for maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this Paragraph 21, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 21, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

22.    **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release the Security Instrument. Borrower shall pay any release fees and costs of recordation unless applicable law provides otherwise.

23.    **Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees out of court, in trial, on appeal, in bankruptcy proceedings, or otherwise.



OFF. REC: 17775 PG 4474

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Mortgage and in any rider(s) executed by Borrower simultaneously herewith and attached hereto.

_____
Gregory Pillon
(Witness)

_____
Darryl Pillon
(Witness)

Nadine V. Murray _____ (Seal)
Nadine V Murray            -Borrower
(Print Name)

3098 NW 98th Street
Miami, FL 33147
            [ADDRESS]

_____ (Seal)
Charles P Murray            Borrower
(Print Name)

3098 NW 98th Street
Miami, FL 33147
            [ADDRESS]

_____ (Seal)
            -Borrower
(Print Name)

            [ADDRESS]

_____ (Seal)
            -Borrower
(Print Name)

            [ADDRESS]

STATE OF FLORIDA,            DADE            County ss:

The foregoing instrument was acknowledged before me this   29th day of August, 1997   by
Charles P. Murray and Nadine V. Murray, his wife

who is or are personally known to me or who has or have produced   Florida Drivers Licenses
as identification.

_____
Notary Public
Serial No.
Gregory Pillon
Notary Public, State of Florida

            0099416653



OH.
REC 18398 PG 3095

98R612992 1998 DEC 10 12:25

Recording Requested by:
**The Money Store**
After Recording Mail to:
The Money Store
4837 Watt Avenue
North Highlands, CA 95660

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA
RECORD VERIFIED
HARVEY RUVIN
CLERK CIRCUIT COURT

Dated: August 15, 1998          SPACE ABOVE THIS LINE IS FOR RECORDERS USE ONLY

### CORPORATION ASSIGNMENT OF MORTGAGE/DEED OF TRUST

For Value Received, TMS Mortgage Inc., D.B.A. The Money Store, A New Jersey Corporation, 2840 Morris Avenue, Union, NJ 07083 hereby grants and transfers to:

**The Bank of New York, as Trustee under the Pooling and Servicing Agreement dated as of August 31, 1997, Series 1997-C**

whose address is 20 Broad Street, LL-2, New York City, NY 10005, all beneficial interest under that certain Mortgage dated 8/29/97, in the amount of $96,300.00 , executed by Charles P. Murray and Nadine V Murray, his wife, Borrower, and TMS Mortgage Inc., DBA The Money Store, Lender/Trustee, and recorded as Bk. 17775, Pg., 4467, on 9/4/97, in the Official Records of the Dade County Recorder's office in the State of FL, describing the land therein as: 3098 Nw 98Th Street, Miami, FL, 33147

#### AS MORE PARTICULARLY DESCRIBED IN SAID MORTGAGE

Together with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.

TMS Mortgage Inc., D.B.A. The Money Store, A New Jersey Corporation.

Linda Wheeler, Vice President

State of California
County of Sacramento

On August 15, 1998 before me, the undersigned notary public, personally appeared Linda Wheeler, Vice President, of TMS Mortgage Inc., DBA The Money Store, who reside at 4837 Watt Avenue, North Highlands, CA 95660, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument, they, or the entity upon behalf of which they acted, executed the instrument.

Witness my hand and official seal.



_____ , Notary Public

Loan# 0098416853
Borrower's Last Name: Murray
This instrument was prepared by: Nonko Oshima, (800)562-6937, 4837 Watt Ave. North Highlands, CA 95660

CHERYL SCHAER
COMMISSION #1079375
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
MY COMM. EXPIRES DEC 10, 1999